## IN UNITED STATES DISTRICT COURT
## <u>FOR THE DISTRICT OF MARYLAND</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.  JRR-23-327** |
| **JALEN THOMAS KELLEY,** | **Filed under seal** |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

Jalen Thomas Kelley is a serial predator who stands before the Court convicted of raping 17-year-old ███████████ ("Victim 1") aboard a cruise ship while her parents, friends, and family were just steps away unable to help. In isolating and then raping ████, the Defendant shattered her sense of safety and privacy, just as he had done to others before. And as he did before, the Defendant gaslit his victim and lied about his crime in order to silence his victim, which allowed him to continue preying on others.



1

After a jury trial, the Defendant is facing a maximum sentence of life—a serious  sentence for an egregious crime—while the United States Sentencing Guidelines calls for the Court to impose a sentence of up to 19 years for his conviction alone. However, in imposing sentence the law calls for the Court to evaluate not only the Defendant's heinous crime, but also who he is as a person, the need for deterrence, and the need for the Court to protect the public from future crimes. In this case, the sentencing factors call for a term of incarceration far above the United States Sentencing Guidelines range. The Defendant has shown a callous disregard for the autonomy of others. He has shown no remorse for his predatory conduct. He has demonstrated no redeeming qualities beyond a certain athletic prowess and a slick ability to manipulate others to bend to his will. The Government's requested sentence may be harsh, but it is no harsher than necessary to reflect his significant crimes and to protect the public from him until he reaches an age where he may no longer represent the same danger.

The Government recommends the Court sentence Jalen Thomas Kelley to a term of imprisonment of 30 years (360 months) followed by a lifetime of supervised release. Such a sentence is warranted and just.

## I.    <u>BACKGROUND</u>

On December 12, 2024, a jury found the Defendant guilty of Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(a)(1), Sexual Abuse, in violation of 18 U.S.C. § 2242(3), and Assault within the Territorial Jurisdiction, in violation of 18 U.S.C. § 113(a)(1).

The sentencing hearing on this matter is scheduled for May 1, 2025. United States Probation Officer Carissa Perez prepared the Pre-Sentence Report (ECF 160), which provides for a final offense level of 36, a criminal history category I, and advisory sentencing guidelines of 188 months to 235 months imprisonment. The Government agrees with the guideline calculation in the

Pre-Sentence Report (PSR).

## II.    FACTUAL BACKGROUND

### A.    The Defendant's Sexual Assault of Victim 1

The Defendant's conviction on Counts One, Two, and Three all stem from an incident that occurred while aboard the cruise ship, Carnival Legend, that left from the Port of Baltimore, Maryland, on December 26, 2022, and returned on January 2, 2023. The evidence at trial established that Victim 1, who turned seventeen while on the cruise, met the Defendant while aboard the ship. Victim 1 first met the Defendant in the early morning hours of January 1, 2023, after a New Years Eve Party. The Defendant introduced himself to Victim 1 with several false names.

On the evening of January 1, 2023, while in a lounge on the ship with a group of people, Victim 1, who had been drinking, indicated that she needed to go to the bathroom. The Defendant volunteered to take Victim 1 to the bathroom. Rather than take Victim 1 to the public bathroom on the other side of the lounge, the Defendant took Victim 1 up a flight of stairs to his room. As soon as Victim 1 walked into the door, she stated "I cannot fuck you, I'm very drunk."

Victim 1 used the bathroom quickly in the Defendant's cabin without flushing. Upon exiting the bathroom, the Defendant pushed Victim 1 against the bed, face first, and forcibly penetrated her vagina with his penis. Victim 1 swiped back against the Defendant but then he held her hands down. After raping Victim 1, the Defendant asked Victim 1, "you good?" Immediately following the rape, Victim 1 pulled up her pants and exited the room. The Defendant asked Victim 1 for her social media account username, and Victim 1 responded by giving him a false username, which the Defendant wrote in the notes section of his phone.

Victim 1 disclosed the rape to her brother and other witnesses on the cruise ship shortly

3

after the incident while still aboard the cruise ship. Victim 1 provided information that allowed her brother and others to identify the Defendant and the Defendant's room. Victim 1's brother and other individuals went to the room and confronted the Defendant, a conversation that was captured on a cell phone video. During that conversation, the Defendant acknowledged that Victim 1 had been in his room but denied raping her.

The cruise ship returned to Baltimore the following morning, January 2, 2023. Victim 1 exited the ship and returned to her home in Virginia. That evening she reported the rape to her parents and subsequently reported it to the police. Victim 1 was referred to a local hospital to have a sexual assault forensic examination. That exam showed several bruises on Victim 1's extremities, including an oval 1 cm by 0.75 cm light purple bruise on her right wrist/forearm where the Defendant grabbed her, and bruises on her shins where she was pushed against the Defendant's bed. The exam also revealed vaginal abrasions, tearing, bleeding, and bruising.

On April 18, 2023, FBI investigators interviewed the Defendant. During the interview, the Defendant claimed that Victim 1 came onto him and that he resisted her. He denied, multiple times, that they had any sexual contact of any sort.

**B.      The Defendant's Long History of Sexual Assault**

Decades ago, the Supreme Court recognized the special character of criminal sentencing proceedings:

> Highly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.  And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigorous adherence to restrictive rules of evidence properly applicable to the trial.

*Williams v. State of New York*, 337 U.S. 241, 247 (1949) (Black, J.). That principle has been codified for sentencing proceedings in the federal criminal courts by 18 U.S.C. § 3661, which

provides that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The courts have also established that the Confrontation Clause does not apply to sentencing proceedings. *Williams v. United States*, 337 U.S. 241, 250 (1949); *United States v. Francis*, 39 F.3d 803, 810 (7th Cir. 1994) ("the pre-Guidelines policy of allowing sentencing courts to obtain all relevant sentencing information without the strictures of the right of confrontation remains intact"); *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir. 1992).[1]

Under the current law, to include an analysis of the history and characteristics of the Defendant, it is therefore essential for the Court to consider his long history of sexual predation on others, dating back to when he was 11 years old—a virtually unbroken chain of havoc that he still denies. On November 14, 2024, the Court ruled that pursuant to Federal Rule of Evidence 413, the Government could admit evidence of additional victims of sexual assault by Jalen Thomas Kelley. In total, the Government is aware of ten additional victims, *in addition to Victim 1*. The story of each victim is itself heartbreaking. Six of those victims summoned the strength to testify in open court and subject themselves to cross examination, allowing the Court and the jury the opportunity

---

[1] Accordingly, the government may properly present at sentencing a wide array of information about a defendant's character and past conduct derived from many sources, including grand jury testimony, affidavits, law enforcement reports, and summary testimony by law enforcement officers. *See, e.g.*, Fed. R. Evid. 1101(d)(3) (the Federal Rules of Evidence do not apply to sentencing proceedings); U.S.S.G. § 6A1.3(a) & (comment.); *Williams*, 337 U.S. at 246 (noting with approval the use of affidavits in sentencing proceedings); *Francis*, 39 F.3d at 809-811 ("a sentencing judge is free to consider a wide range of information, including hearsay evidence, regardless of its admissibility at trial"); *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 25 (1st Cir. 1994); *United States v. Zuleta-Alvarez*, 922 F.2d 33, 36 (1st Cir. 1990) (grand jury testimony is presumptively reliable for sentencing purposes); *United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990) ("The trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain."); *United States v. Manuel*, 912 F.2d 204, 207 (8th Cir. 1990); *United States v. Roberts*, 881 F.2d 95, 105 (4th Cir. 1989) ("Hearsay evidence has long been allowed in sentencing proceedings . . . ."); *United States v. Pugliese*, 805 F.2d 1117, 1123 (2d Cir. 1986); *United States v. Fatico*, 579 F.2d 707, 712 (2d Cir. 1978) ("Due Process does not prevent use in sentencing of out-of-court declarations by an unidentified informant where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means.").

to hear their story. Four additional witnesses have been interviewed, and the Government relies on their statements as well, because their stories are every bit as reliable as the victims who did testify. The damage caused by the Defendant to every one of his victims matters—because each of those people matter and because their truths should no longer be silenced, disregarded, or discredited.

While the Defendant's assaults of other victims do not factor into the Guidelines calculation, they are certainly relevant to the ultimate sentencing factors found in 18 U.S.C. § 3553(a). Collectively, their stories paint the accurate picture of the person the Court has before it for sentencing.

**Victim 2 –**



testified at trial that she

Between 2013 and 2017, the Defendant sexually abused Victim 2 on a regular basis while Victim 2 was approximately 9 to 13 years old, and the Defendant was 11 to 15 years old. The sexual abuse included repeated touching both over and under Victim 2's clothing of her genitalia and breast area, grinding of his pelvis on her, and on at least one occasion the Defendant took out his penis and pushed it against Victim's 2's exposed vagina from behind.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

**Victim 3 –** ████████████████



████████████████████ was sexually assaulted by the Defendant while both were students at ██████ Middle School in ██████ Maryland. The first incident occurred during the sixth grade, 2016. One evening, while both Victim 3 and the Defendant were in the school building ████████████████████████████ the Defendant approached Victim 3 while he was at the urinal in the bathroom. The Defendant approached Victim 3 and hugged him from behind, and then pulled Victim 3 to the wall.  The Defendant then caused Victim 3 to do other sexual acts. Victim 3 described the acts as coercive, "like a coercion," during trial.

From sixth through eighth grade, Victim 3 engaged in sexual acts with the Defendant. Victim 3 also performed oral sex on the Defendant. One time, in eighth grade, the Defendant was forceful and Victim 3 almost vomited. Victim 3 tried to leave, and the Defendant pushed him

against the bathroom wall, choked him, and tried to kiss him.

Victim 3 did not tell anyone about what was happening until eighth grade. When he did, the Defendant lied and said that no sexual conduct had occurred at all besides admitting he was in the bathroom with Victim 3 on the opening night of their play. Victim 3 again reported what had happened, upon entering ninth grade when he learned of the assault of Victim 5. Again, his reports of the Defendant's sexual assault was met with lies by the Defendant and dismissal by those in a position to help.

**Victim 4 –** ███████████████

███████████████ was 13 years old on May 18, 2017 when she reported that Kelley, then 14 years old, had sexually assaulted her. Victim 4 stated that Kelley had asked her for a hug and to go to an area of the school where there were no cameras. Victim 4 did give Kelley a hug, and Kelley began to reach for her buttocks. Victim 4 pushed Kelley away. Victim 4 began to walk away, and Kelley asked if he could give her a hug from behind. Later in the day, Victim 4 confronted Kelley about his behavior, and Kelley again touched her buttocks without her permission.

Investigators interviewed Kelley in the presence of his parents about these allegations. Kelley advised that he had found out through friends that Victim 4 liked him and that, every time he saw Victim 4, she was always asking for hugs. He said that Victim 4 came looking for a firm answer if they were going to be in a relationship with each other. He said that he gave her one more hug and informed her that he does not feel the same way about her. He stated that he did not attempt to touch her buttocks. Nothing further was done.

**Victim 5 –** 



The Court, no doubt, remembers ████████, who left the court in tears after her testimony and cross examination in this case. She testified that she was sexually assaulted by the Defendant on September 27, 2018, and October 2, 2018, while ████████████ High School in ████████ Maryland. On September 27, 2018, Victim 5 met the Defendant in a stairwell to talk. At one point, the Defendant grabbed Victim 5 in the genital area, and Victim 5 stepped away. When other people approached, the Defendant stepped away. On October 2, 2018, Victim 5 met with the Defendant to confront him. While they were in a corner and out of sight, the Defendant grabbed Victim 5 from behind and grinded his erect penis against her from behind. He was gripping her tightly around her chest. Victim 5 broke free from his grasp.

Victim 5 reported what happened to Victim 4 and both Victims 4 and 5 reported their assaults by the Defendant to school authorities. Victim 5 transferred schools as a result of the Defendant's actions.

**Victim 6 –** ████████

On April 3, 2019, Victim 6, then 16 years old, reported that Kelley, also 16 years old, had sexually assaulted her in the hallway at ████████ High School. Victim 6 stated:

> He always tries to hug me so to be nice I just gave him a side hug. After I gave him a side hug, he picked me up, and I struggled to get away from him.

He then wrapped his arms around me from behind and grinded me with his pelvis.

The report indicates that security footage depicted Kelley and Victim 6 outside of camera view, but their shadows can be seen, and Kelley does pick Victim 6 up, the shadows then separated momentarily, and then came back together.

When questioned by the School Resource Officer, Kelley stated that he and Victim 6 are friends and "play around with each other . . . We hugged each other, then I was playing around and picked her up. She was laughing so I put my arms around her from behind her. I did not grind her though." He was given a sexual harassment pamphlet and signed ██ █████ High School "no contact" contract.

**Victim 7 –** █████████



The Defendant sexually assaulted █████████ on September 16, 2019. Victim 7 first met Kelley in eighth grade, █████████████████████████████ █████████ Then one day in science class, the Defendant tried to put his hand on Victim 7's leg under her dress without her consent, and Victim 7 yelled to stop. Victim 7 went to a different high school during which time she sent the Defendant pictures of her. In tenth grade, Victim 7 transferred to Edgewood High School, the Defendant's school.

On September 16, 2019, when Victim 7 did not have money for lunch, the Defendant gave

her his lunch. He told her that she owed him and asked to meet up outside of class. The Defendant then told Victim 7 that he was going to tell Victim 7's boyfriend that Victim 7 was trying to cheat on him.

Victim 7 went with the Defendant to a stairwell. Victim 7 kissed the Defendant. The Defendant groped Victim 7, and she told him to stop. She could feel him put his penis on her and holding her arm tight. Victim 7 told the Defendant "no" or "stop" at least three times. When the Defendant let go of Victim 7, Victim 7 ran off.

**Victim 8 –** ███████████

After Kelley's arrest in this case, Victim 7 posted about the arrest on social media. One of the individuals who sent Victim 7 a message was Victim 8, who subsequently agreed to sit for a Child/Adolescent Forensic Interview ("CAFI"). During that interview in October 2023, she reported that Kelley raped her in January 2020, when Victim 8 and Kelley were both 17-18 years old. Victim 8 and Kelley worked together at the ███████████████. Victim 8 agreed to get a ride home from Kelley after work one night. Instead of taking her home, Kelley drove to the back of the store and parked. Victim 8 asked to be taken home, and Kelley said he just wanted to talk to her and asked why Victim 8 would not give him a chance. Kelley then tried to kiss Victim 8, and Victim 8 said no and pushed Kelley off of her. Kelley then forced himself on top of Victim 8 and touched her over and under her clothing, attempting to digital penetrate her vagina. Kelley eventually did penetrate Victim 8 with his penis, and Victim 8 dissociated and waited for it to be over as Kelley was not responding to her pleas for him to stop. When Kelley finished, he got off of Victim 8, pulled his pants up and said, "see it wasn't that bad."

**Victim 9 –** 

Victim 9 met the Defendant at

**Victim 10 –**

The Defendant sexually assaulted Brianna Diggs in middle school. Victim 10 was telephonically interviewed by investigators on September 30, 2024.[2] Victim 10 reported that she:

> remembered always feeling uncomfortable around Jalen. On one occasion, while in middle school, [Victim 10] recalled a time          Jalen made her very uncomfortable.          when Jalen came up behind her and started "rubbing up on me." [Victim 10] stated Jalen used his pelvic area to grind her from behind. [Victim 10]

---

[2] 9/30/2024 FD-302 of interview of Victim 10.

remembered telling Jalen to stop and it "got weird." [Victim 10] recalled Jalen saying something inappropriate while he was rubbing up on her, but she could not remember his exact words.

**Victim 12 –** 



Victim 12 was sexually assaulted by the Defendant in 2018 in a stairwell at ████ High School before a basketball game. Prior to the game, Victim 12 was in study hall and decided to walk around the school with a friend. Victim 12 and her friend separated, and Victim 12 headed back toward study hall. The Defendant came from a hallway area and pushed Victim 12 into the back corner area of the stairwell. The Defendant used his body to push Victim 12 towards the corner. The Defendant pulled Victim 12's pants down and covered her mouth with his other hand from the front and inserted his fingers inside her. Victim 12 tried to break away but was unable to because the Defendant was stronger than her. Victim 12 told him to stop but he kept going. The entire experience took a little over five minutes, after which the Defendant walked away.

## III.    <u>SENTENCING CALCULATION</u>

The Defendant's actions on the night of January 1, 2023, make up the instant offenses which group  and result in an  offense score of 36.  While this decidedly is not the Defendant's first sexual assault, he nonetheless has zero criminal history points.  ECF 160, ¶ 44. This results in a guideline sentence 188 months to 235 months (approximately fifteen and a half years to nineteen and a half years).

The maximum sentence that can be imposed for Counts 1 and 2, Aggravated Sexual Abuse and Sexual Abuse, is a life sentence – this can be followed with a period of supervised release of a mandatory minimum of five years up to life and a $250,000, as well as $100 special assessment for each count ($300).

The Defendant has made several objections to the sentencing guidelines as calculated by Probation Officer Carissa Perez. *Id.* at pp 16 -17. Specifically the Defendant objects to the specific offense characteristics for Aggravated Sexual Abuse and Sexual Abuse under U.S.S.G. §2A3.1(b)(4)(B). The Defendant also objects the imposition of some of the recommended special conditions of supervised release.

### A.    Application of "Serious Bodily Injury" Enhancement – U.S.S.G. §2A3.1(b)(4)(B)

The Defendant argues that the serious bodily injuries sustained by Victim 1 should not be included in the Guidelines calculation because of what he incorrectly styles as "double counting." This position fails to acknowledge the true nature of the Defendant's crime and is inconsistent with case law interpreting the Guidelines provisions at issue. Pursuant to United States Sentencing Guidelines (U.S.S.G.) § 2A3.1(a)(2), the base offense level for a violation of 18 U.S.C. § 2241(a) is 30. Because the offense involved conduct described in 18 U.S.C. § 2241(a)—namely sexual abuse by force—that offense is increased four levels, pursuant to U.S.S.G. § 2A3.1(b)(4)(B).

The Defendant objects to the increase of the offense level by two additional levels pursuant to U.S.S.G. 2A3.1(b)(4)(B) not because the victim was not seriously injured, but because he contends the two-level enhancement for serious bodily injury is the same conduct that justifies a four-level increase for sexual abuse by force. This argument has been rejected in other federal courts, and rightly so, because the argument fails to account for the fact that, not only did the Defendant commit criminal sexual abuse by force, but his actions caused serious bodily injury to

14

Victim 1.

The Ninth Circuit analyzed this issue in depth in *United States v. Scott*. 83 F.4th 796 (9th Cir. 2023). That court noted that the Sentencing Guidelines provide different definitions of "serious bodily injury" in U.S.S.G. § 1B1.1, n.1(M) which applies generally to all guideline provisions:

> [1] "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. [2] In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.

Id. § 1B1.1 cmt. n.1(M). Like the Defendant here, the Defendant in *Scott* argued that because § 1B1.1. provides that serious bodily injury is deemed to have occurred for an aggravated sexual abuse offense, the base offense must already account for any serious bodily injury that resulted from the sexual abuse and therefore the enhancement can be applied only when conduct separate and apart from the conduct surrounding the sexual assault resulted in serious bodily injury. *Scott*, 83 F.4th at 801.In reaching their decision, the Ninth Circuit review other circuits previous interpretations of this issue. *See United States v. Long Turkey*, 342 F.3d 856, 858 (8th Cir. 2003) (holding that an "act of sexual abuse is insufficient by itself to support a § 2A3.1(b)(4)(B) enhancement" but that a court can consider "any injuries resulting from an episode of criminal sexual abuse"); *United States v. Jim*, 786 F.3d 802, 814–15 (10th Cir. 2015) (holding that a court may apply the serious bodily injury enhancement based on the victim's injuries resulting directly from the sexual abuse); *cf. United States v. Bell*, 367 F.3d 452, 470 (5th Cir. 2004) (noting that the "serious bodily injury" definitions under § 1B1.1 and § 2A3.1 are inconsistent but declining to "work[ ] out" the inconsistency because there was evidence of serious bodily injury apart from the

rape—the victim's face was swollen as though he had been beaten).

After a review of these circuits, the Ninth Circuit in *Scott* expressly adopted the position of the Tenth Circuit. First, the Ninth and Tenth Circuits refer to the first definition provided in U.S.S.G. § 1B1.1, n.1(M) for "serious bodily injury" as the "Harm Definition," and the second definition provided as the "Conduct Definition." *Scott*, 83 F.4th at 802 (citing *Jim*, 786 F.3d at 814). The Ninth and the Tenth Circuit expressly precluded the use of the "Conduct Definition" when applying the Sexual Abuse Guideline, because the Sexual Abuse Guideline application note explains that guidelines "already accounts for the defendant's sexual abuse *conduct* in the base offense level." *Id.*

However, while the Defendant here, like the Defendant in *Scott*, argued that this was the end of the analysis, the court was clear that nothing in this precluded the use of the "Harm Definition" for examining whether a defendant's sexual abuse by force also caused serious bodily injury and thus warranted an additional two-level increase. *See id.* Such a position is not impermissible double counting:

> [T]he base offense level takes into account the offender's conduct in committing a sexual abuse offense, **not the injuries the victim suffered** . . . the guidelines can enhance a defendant's offense level **both for the egregiousness of his conduct in committing a sex offense and for the injuries inflicted during that offense because those enhancements address different and distinct matters** . . . So long as the district court does not impose the serious-bodily-injury enhancement just on the fact that criminal sexual abuse occurred, there will not be the type of impermissible double-counting about which the district court was concerned.

*Id.* at 802 (quoting *Jim* 786 F.3d at 815-16).

In this case, the Court can make the finding that the Defendant's crimes caused serious bodily injury for the serious vaginal injuries caused by the Defendant, and also for the external injuries he caused as well. While, in the apparent absence of a Fourth Circuit case expressly

16

speaking to this point, the Government guides the Court to use the Ninth and Tenth Circuit's positions. The Government's position that the application should apply is also consistent using the analysis of the Eight Circuit in *Long Turkey*, because the Government is not proposing the Court impose the enhancement merely because of the "act of sexual abuse," but instead because of the injuries "resulting from an episode of criminal sexual abuse." *See id.*, 342 F.3d at 858. The enhancement is also applicable under the analysis of the Fifth Circuit, *Bell* because "there was evidence of serious bodily injury apart from the rape" in the form of external bruises on Victim 1. *See id.*, 367 F.3d 452, 470.

Any discussion of the serious bodily injuries caused by the Defendant as a result of his sexual assault must begin with Victim 1's genital injuries. These injuries were discussed at length at trial by Forensic Nurse Rene Pullen, to include photographs and descriptions. For the purposes of this memorandum, the Government will use only Nurse Pullen's diagram:



The injuries caused by the Defendant were incredibly serious and were atypical of many sexual assaults. Such injuries included a tear of Victim 1's posterior fourchette, an abrasion of the

fossa navicularis that was tender to the touch, and a bruise of the hymen. Nurse Pullen also discussed how the injuries began to bleed again during examination. The photographs admitted into evidence themselves, including that of blood in Victim 1's underwear, would be sufficient for the Court to understand the pain Victim 1 was in, but the Court also heard testimony from Victim 1 regarding the pain, including how when she bathed, she could feel soreness and burning in her genital area.

To be clear, the Court's consideration of these injuries is separate and apart from an appliable base offense enhancement merely because of the act of sexual assault was by force. Sexual assault by force does not automatically cause injuries this severe in nature, which is why the enhancement applies. However, the Court can also consider the serious external injuries caused by the Defendant. Those injuries include the bruises on her right forearm from where the Defendant grabbed her and violently held her:



The Court is also familiar with the testimony at trial that the Defendant pinned Victim 1 against the bed in his room. That bed had a metal frame, against which the Defendant pressed Victim 1. The force with which he pinned her was so strong that it left bilateral bruises on her

shins, as follows:



The Defendant did not merely sexually assault Victim 1. The Defendant did so with such force that he caused her significant vaginal injuries. He further used such violence in grabbing and holding her that he caused bruising on her body. It is therefore the correct application of the Sentence Guidelines to apply an additional two-level enhancement for serious bodily injury.

**B.    The Court Must Impose a Requirement the Defendant Be Subjected to Polygraph Examinations When he is Released for the Protection of Others and to Facilitate his Rehabilitation.**

The Defendant objects to several of the special conditions of supervised release to include financial disclosure, no contact with anyone under the age of 18, refraining from going to places where the Defendant knows children under the age of 18 are likely to be as well as other conditions concerning minors, and finally polygraph testing.  The Government will defer to the court as to all of these conditions with the exception of polygraph testing as the Government believes that condition should be imposed.

In the PSR, under the Additional Recommend Conditions of Supervision, the United States Probation Office (USPO) recommends that the Defendant submit "to periodic polygraph testing at the discretion of the probation officer as a means to ensure that [the defendant] is in compliance with the requirements of [his] supervision or treatment program.  ECF 160, p. 22, ¶ 7.

In this case, the Defendant raped Victim 1, and, under F. Rule of Evid. 413, six other

victims testified that they too were sexually assaulted by the Defendant either before or after the instant offense.  During the investigation, the Defendant lied to investigators about having any sexual contact with Victim 1 and then reversed course, spending the entire trial blaming Victim 1, arguing that the encounter was consensual.  This defense stood in direct and stark contrast with the Defendant's assertions during the investigation that he and Victim 1 did not have sex at all. The Defendant has also almost always denied any sexual contact with his other victims.

Given the breadth of his offenses over many years, the importance that this Defendant receive treatment and actual comply with it, as well as all of the other parameters of his supervision, cannot be overstated.  His prior manipulations and attempts to manipulate people and systems already in place make it imperative that his probation officer be given every possible tool to assess the Defendant's truthfulness about his compliance with treatment and supervision.  As the Court is aware, the results of polygraph testing are inadmissible in Court for any purpose and cannot form the basis for any violations of supervised release or potential new allegations.  The polygraph is however a tool that can help USPO monitor the Defendant's behaviors and level of compliance, which is of extreme importance in this case.

## IV.  <u>ARGUMENT</u>

The Defendant is a predator.  He has demonstrated no remorse for—or even acknowledgement of—his many sexual assaults. Through his rape of ███████, he has forever changed her life, and that of her family. There is no sentencing factor imposed by law that justifies leniency in sentencing in this case. Rather, every factor calls for a significant sentence, one greater than the Guidelines range that is applicable merely for the rape for which he was prosecuted. He has long been a danger to society, and he belongs in prison until such time where he may again have the opportunity to demonstrate that he no longer represents that danger.

"In sentencing a Defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a).  *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008).  This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual Defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter."  *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the Defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the Defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated Defendants for to avoid sentence disparities.  18 U.S.C. § 3553(a)(6).

The Defendant's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), demands a sentence of 30 years imprisonment and lifetime supervision.

**A.  Nature and circumstances of the offense**

The offense for which the Defendant was convicted at trial was abhorrent. The more you think about the crime, the more terrifying it becomes. The Defendant represents one of the worst fears a woman feels in a foreign place: that a man she does not know passes himself off to be a trustworthy person to get her into a vulnerable position and then physically overwhelms and sexually assaults her. Seemingly random acts of violence like those of the Defendant have an insidious ability to strike fear in women not just on cruise ships, but in any area in which they may be alone with a man.

The Defendant's crime was unprovoked, not born of passion, whim, or caprice. Rather, the Defendant stalked his prey, prowling around a group of younger people experimenting with alcohol while he remained sober and clearheaded. He did this until he identified a girl who was not only intoxicated, but also inexperienced. He lingered, concealing his real name and identity, until he saw his opening and set his trap. When Victim 1 said she needed to use the bathroom, he offered up his own, not steps away in the lounge, but up a flight of stairs and away from the crowd and her friends, behind a locked door. As he led her up the stairs, it is clear based on all available evidence that he already knew his intentions with Victim 1, regardless of her lack of consent.

This was not a case of mistaken consent or confusion. The evidence is clear that Victim 1 told the Defendant that she was not interested in having sex with him, declaring it before she entered the room with him. In fact, there is no evidence the Defendant even tried to convince her to have sex with him. There is no evidence of any conversation where she led him on or gave him mixed signals, with a "let's get out of here" wink and a nod. She proceeded to walk directly to the bathroom, moving so quickly that she did not even flush the toilet, and proceeded to leave as quickly as she came in. The Defendant waited outside the bathroom and grabbed her without saying a single word. The objective evidence is clear that the Defendant knew what he was doing,

22

and he made a conscious choice to rape Victim 1. He forced her against his metal bedframe, forcibly removed her pants, and penetrated her violently.

His actions afterwards further demonstrate the seriousness of the offense. After raping her, the Defendant said the words, "you good?" in an obvious attempt to gaslight his victim and convince her that she had been a willing party to his actions, just as he had done with other victims previously. At trial, the Court had the opportunity to observe how calmly and cooly the Defendant lied to Victim 1's brother and his friends. The video shows that, rather than demonstrating remorse or sorrow for what he did, the Defendant calmly milked Victim 1's brother for information in an attempt to calibrate his own story. For example, the Defendant asked, "Did she say we made out?" "Or is she saying that something happened to where she's not a virgin anymore?" He then proceeded to point out that he was sober, while Victim 1 was drunk, and saying "So you have pieces of the story from both sides and not getting both sides." The Defendant's conduct that evening shows just how comfortable he was committing this crime and then manipulating the narrative. Each and every step he took was calculated to isolate Victim 1, violate her, and then denigrate and delegitimize her to those she reported her crime, leaving him satisfied and her in pieces.

### B.  History and characteristics of the Defendant

Of course, the Defendant's heinous crime comes as no surprise to his many prior victims. The Defendant may have no criminal history points, but he is not a person without a criminal history. Instead, he is a serial sexual abuser. It is unknown to the Government what rationale the Defendant may produce, if any, that he may attempt to excuse his actions, but there is simply no justification that can suffice. No amount of hurt or confusion, failed parenting or intervention, or any other excuse can explain away the damage he has done to the lives of his victims. When the

23

Court reviews the Defendant's history and characteristics, they tilt heavily towards a significant sentence.

The Court is aware of the Defendant's lengthy history of sexual assault, dating at least back to the age of 11. The Court received extensive briefing in the pretrial phase in this case, including reviewing reports describing those assaults. In addition, the Court heard from six additional victims during the trial who told their stories under oath and subjected themselves to cross examination so that the Court and the jury could have the benefit of complete information. The repeated, predatory nature of the Defendant's conduct is stark and disturbing. The Court itself noted as such during the pretrial motions hearing in this matter, stating:

> [W]hat was very poignant to me and really sort of led my nose in the issues of similarities, is that on some level it is the granular level similarities that are nearly universal that I find to be more persuasive with respect to the question of similarity than that global, sort of long-range view of dissimilarities.

November 14, 2024 Motions Hearing Tr. at 142, ¶ 6-11. The Court went on to correctly note "an overwhelming degree of similarity in terms of the alleged approach of the victim, the alleged manner in which Mr. Kelley is alleged to have touched without consent each of these witnesses." *Id.* at 146, ¶ 21-24. The Court next properly summarized what the Government posited the evidence would prove:

> It seeks to demonstrate that Mr. Kelley has had, since a young age, a propensity to engage in nonconsensual sexual activity; and the fact that there is really no intervening act because these acts happened fairly close in time throughout his young life, allegedly; and the frequency with which they are alleged to have occurred also ties into the temporal proximity.

*Id.* at 147, ¶ 8-13. The Government submits that this is exactly what the evidence proved at trial, beyond all doubt. The Defendant is either unable or unwilling to control himself when it comes to his sexual urges.



Undoubtedly, there were a number of moments where those around the Defendant could have done more to stop him. ███████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. When the many victims at the Defendant's different schools reported to authorities the sexual abuses of the Defendant, the schools (and police) could have done more to stop him. But these are not reasons to reduce the Defendant's sentence. In fact, these are reasons to *increase* his sentence. Because it is the *Defendant* who manipulated his family members and the system to discredit his victims. The Defendant used his confidence, charisma, and cunning ability to weave a story to turn the narrative against his victims.

The Defendant's longstanding ability to talk his way out of trouble was evident during trial when we watched his interview with FBI agents investigating the rape. He joked with them, attempted to disarm them with discussions of their lengthy drive, and tried to charm his way out of responsibility. He innocently expressed fear that he was in trouble for having a candle in his

dorm room. When he became certain what the agents were there to talk about, he cooly attempted to undermine the credibility of his victim, with statements such as, "I'm guessing she was a little tipsy because, you know, she got the touchy-touchy-feely-feely," "I'm assuming she was under the influence," "I don't know this female, I was just trying to make a kind gesture the last day of the cruise."  Transcript of Government's Exhibit 78 at pages 10, 12, 13. These statements were followed by the most appalling falsehood spun by the Defendant, given the testimony of his stepsister that he had sexually assaulted her for years during childhood:

> I have a sister of my own, so I would hate to, you know, be in the same situation. Hence why I said, if there's anything that you need me to do anything at all.

*Id.* at 16. The Defendant's conduct in this case, when combined with his long history of assault and lies, borders on the pathological.

The Defendant was apprised of the wrongfulness of his conduct, repeatedly. He was given opportunity after opportunity to correct his behavior. No one told him it was acceptable to take sexual liberties with unwilling victims. No one told him that a lack of consent is consent. The message the Defendant appears to have learned from his many interactions with victims and authorities is that, if you lie well enough, you can skirt responsibility for your actions. Jalen Thomas Kelley is not a victim of a system that failed him, or one that failed to apprise him of the wrongfulness of his conduct. While the system may have failed victims, it failed because Jalen Thomas Kelley took steps to hide his crimes, lied to investigators and school administrators, and gaslit his victims, all demonstrating his knowledge of his wrongful acts.  Jalen Thomas Kelley is not the product of a failed system—he is a contributing cause to its failure. For this, he merits a significant sentence.

### C.  Additional Factors that Lead to An Above Guidelines Sentence

1. **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). The Defendant's actions violated federal law, but they also transgressed every conceivable normative principle undergirding our laws. The Defendant's conduct demonstrates that he has no respect for the law. He has been accused of sexual assault several times before, had juvenile intervention and counseling, and yet he did not and could not refrain from his brutal violations of Victim 1. This Court's sentence must express an appropriate level of social condemnation of his crimes.

The Defendant's crime is offensive in itself, and thus meritorious of a significant sentence of incarceration. However, as stated before, the Defendant is not a first-time offender. He has been investigated by the criminal justice system repeatedly during his life. Through his choice to continue to commit sexual assault, he has demonstrated that he has no more respect for the criminal justice system than he does for the personal autonomy of his victims. The Court's sentence should thus promote a respect for the law and send a message that the Defendant's time has come.

2. **The Need for the Sentence to Provide Adequate Deterrence and the Need to Protect the Public.**

Simply put: the Defendant represents an ongoing danger to society. He has exhibited a continual pattern of attacking girls and women;[3] with so many of these allegations reported and notice given to the Defendant that his behaviors are unlawful. Even the rape of Victim 1, his confrontation by her friends and family, and his interview by the FBI where it was clear he was being investigated for rape, did not stop him. He proceeded to rape Victim 9. Thus, there exists a compelling need to protect the public from the Defendant,

---

[3] Of course Victim 3 is biologically male. This and any other general statement about the Defendant "attacking girls and women," reflects that 10 out of his 11 victims were female and is not meant to exclude or marginalize Victim 3.

The Court had occasion to review the rationale behind Congress' enactment of Federal Rules of Evidence 413-415 in pretrial litigation. As part of that rationale, the legislative sponsors of that rule stated that, "The . . . reform [effected by these rules] is critical to the protection of the public . . . and is justified by the distinctive characteristics of the cases to which it [applies]. 140 Cong. Rec. 23603. They continued:

> [A]dult-victim sexual assault cases are distinctive, and often turn on difficult credibility determinations. . . . Knowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of these claims and accurately deciding cases that would otherwise become unresolvable swearing matches. . .

*Id.* Congress understood the danger of people like the Defendant. They have demonstrated, by the crafting of statutes to protect the words of victims, the need to protect the public from such crimes.

Often, as part of the analysis in this factor, courts will focus on the need for the sentence to provide general deterrence. Defendants regularly claim that they have been adequately deterred by prosecution and no further punishment is necessary. To be clear, general deterrence is an appropriate rationale underpinning a significant sentence in a rape case. The Court's sentence must be significant enough so that others will know and understand their predatory targeting of girls, women, or any person will be uncovered, and that violators will be punished accordingly no matter the passage of time or delay in a victim's disclosure.

But the need for specific deterrence outweighs even the great need for general deterrence in this case. The Court has absolutely nothing on which to base a finding that the Defendant has been adequately deterred. The Defendant was not deterred by being confronted by his victims. He was not deterred by being confronted by his family members. He was not deterred by being confronted by classmates. He was not deterred by being confronted by school administrators or local law enforcement officers. He was not deterred by the juvenile justice system. He was not

28

deterred by being investigated by the Federal Bureau of Investigation. Then, when charged with rape in this case, he proceeded to attack Victim 1 and his other victims in trial through cross examination and arguments alleging they perjured themselves.[4] There is nothing to suggest any of these many interventions in his life have convinced him of the wrongfulness of his conduct. Additionally, given the decade of lies he has spun regarding his conduct, the Court should give no credence to any claims that he now somehow understands the wrongfulness of his actions. His word carries no weight. He has no credibility. Only a significant sentence of incarceration can protect the public from him.

### D.  The Impact of the Crime on the Defendant's Victim

The Defendant's crime has altered the lives of his victims and their families. He has shattered their sense of privacy and their sense of safety, and he has harmed the relationships of families and friends. The Court's sentence will not fix these issues, but it should be strong enough to reflect that impact.

Victim 1, in her moving submission, reflected the harm caused by the Defendant as follows:[5]

> You ruined my trust in people. You ruined my willingness to surrender in unfamiliar environments. You killed the upbeat, half glass full person I used to be. Your selfish act on that night strangled the last bit of hope I had to be "normal." You ruined my sanity when I am either alone or surrounded by strangers, but you didn't ruin me.

Victim 1's mother painfully described the damage done as well:

> The raw truth is, she found out the hard way that people are not basically "good." In a minute, her world was shattered ... as was ours.

---

[4] It is noteworthy that in the Defendant's submission to the Office of Probation regarding the statement of facts to the Presentence Report, the Defendant requests the phrase, "The evidence at trial established that Victim 1," be modified to "Victim 1 testified that."

[5] The Government will be submitting the victim impact statements and supporting statements of Victim 1, her mother, and her brother, at or near the time of this submission.

In the dark shadows, she learned that even though someone appears to be a "good, up-standing citizen" -- they could just as easily be a predator: a "wolf in sheep's clothing."

She learned that her virtue could be stolen, innocence robbed, and self-worth destroyed in a matter of minutes.

███ knows that she will never be the same ... she lives with fear, anger and loneliness. Her days are consumed with hyper-vigilance and her sleepless nights are haunted by nightmares.

Counseling and therapy have been unsuccessful. She cannot get her hair done in a salon because she can't stand for anyone to be behind her.

She doesn't trust anyone except closest family and friends and even then an impulsive, unexpected hug triggers dark memories and sets her trembling.

She shuts people out and will not entertain the idea of having a date, much less a close personal relationship.

This now-19-year-old girl will not even dress-up or fix-up her hair and put on make-up for fear that someone will look at her.

She recently commented that she was putting on a little weight, but that she was "OK with that" because now she won't have to worry that anyone would want her.

Our daughter will not take a family trip that involves any kind of beach or tropical setting because it brings back too many haunting memories.

She does not leave the house without her protective service dog by her side - he is her only assurance of protection.

This is not healthy behavior. What is the prescription for living free of a "victim mindset"?

Victim 1's brother, forced into being a witness in the story of his own sister's rape, described echoed the damage in this way:

The consequences of his actions are embedded in my sister's mind, body, and future. She cannot bear to be touched—not by friends, not by family, not even by those who love her most. Something as simple as a hug—a universal gesture of comfort—has become a trigger. She flinches at unexpected movement, terrified when someone stands behind her, because her body

30

remembers what was done to her. These are not choices she makes. They are involuntary responses—residue left by trauma.

███████ is strong, far stronger than the Defendant. But she will never be the same. She is forever scarred because of the Defendant. The sentence imposed by the Court must reflect that. As her brother stated so poignantly, "my sister will live with the impact of his choices for the rest of her life. She cannot appeal it. She cannot reduce it. She cannot erase it. Justice should reflect that permanence." *Id.*

Each of the Defendant's other victims experienced trauma in the months and years after the Defendant sexually assaulted them. Each have lived with the never-ending echoes of the day they were assaulted at school, at work, in a dorm room, in places that were once safe. In cases of sexual assault, the ammunition used in defense often translates to a simple presumption that the accuser, the victim, is lying. It is often the victims who feel that they, rather than their perpetrator, are on trial. And here, six of the victims bravely faced cross examination and insinuations that they made up these allegations, their traumas, because the Defendant rebuffed them or rejected them or because they wanted attention. A meaningful sentence imposed by the Court should also reflect that these victims are believed, they are seen, and they matter.

## IV. <u>CONCLUSION</u>

The Defendant raped ███████ on January 1, 2023, and her young life has been forever altered because of it. The Defendant began his trail of offenses well before Victim 1 boarded the cruise ship, and the Defendant shockingly did not stop after the cruise docked. He is a predator; he is simply unable to stop, unable to learn, unable to conduct himself such that girls and women are safe in his presence. His conduct must be adequately punished. A sentence of 30 years, followed by lifetime supervised release, adequately accounts for the §3553(a) factors and is sufficient but not greater than necessary. The sentence imposed by this Court should leave no doubt

that when the Defendant is one day released from incarceration, he <u>will</u> hesitate to commit sexual assault or force victims to bend to his sexual whims; such a sentence should also send the message that rapists who prey upon women, will receive a significant sentence.

The United States requests that this Court should sentence the Defendant to 30 years imprisonment.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____
Sean R. Delaney
Colleen Elizabeth McGuinn
Assistant United States Attorneys

CC:    Carissa Perez, USPO
Maggie Grace, Esq.
Sedira Banan, Esq.