## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. JRR-23-327** |
| **JALEN KELLEY** | |

## DEFENSE SENTENCING MEMORANDUM

**EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Character Letters |
| B | Family Photos |
| C | Protective Order |
| D | ████████ |
| E | ████████ |
| F | College Academic Records |
| G | CDF Transcript and Certificates |
| H | Dr. Jennifer Woolard Brief |
| I | Article, Roger Pryzybylski, "The Effectiveness of Treatment for Juveniles Who Sexually Offend" (July 2015) |

## <u>INTRODUCTION</u>

This sentencing is emotionally heavy. The Defense acknowledges the toll this case has taken on everyone involved, particularly the young people at the center of the case. In continuing to protect Jalen Kelley's assertion of innocence and advocate for rehabilitation in the community rather than prolonged incarceration, defense counsel recognizes that young persons and their family members have experienced and continue to experience a depth of trauma and pain. This reality was apparent in days of courtroom testimony and in the victim impact letters submitted. The Court is in an unenviable position of sentencing in a case laden with the sorrow of youth interrupted.

In these fraught cases, courts take heightened care to guard against unrestrained emotions overpowering the § 3553(a) enumerated factors in fashioning a sentence that is sufficient but not greater than is necessary to fulfill the goals of sentencing. The Defense endeavors in this memorandum to provide the Court with the essential information necessary to assist the Court in conducting an individualized sentencing analysis under the § 3553(a) factors. Throughout this memorandum when providing information regarding Jalen Kelley's history, including family ████████ and missed opportunities for meaningful intervention, the Defense in no way seeks to shift blame or minimize human pain and suffering. Counsel's responsibility is to provide pertinent information for the Court's sentencing consideration in fashioning a reasonable sentence.

Beyond the surface of Jalen Kelley as a young college student athlete, son and brother in a loving, ██████████████,[1] is a history that, when understood with the context provided herein, reveals a young person who is not an incorrigible, deviant predator undeserving of rehabilitation

---

[1] We direct the Court's attention to character letters at Exhibit A and additional family photos at Exhibit B.

in the community while he is still young. While it was of course not inevitable for Jalen to find himself seated in a federal courtroom facing sentencing for serious convictions, early and persistent unhealthy influences and insufficient earlier interventions contributed to his fraught situation. Even in maintaining his innocence, it is apparent there were repeated signs throughout his early childhood that he needed far more therapeutic support than he was afforded. Yet, because he was a *child*, including as young as 11, in a ███████ family environment, he lacked the means to advocate for himself to receive the help he needed. He is now paying the price not just for his actions, but for the inaction of adults entrusted to shape and guide him.

At the heart of this case is Jalen Kelley's youth, both at the time of the offense conduct (age 20) and today (age 22). The Supreme Court has recognized again and again that youth matters in sentencing, particularly because it explains how misguided youth behavior does not indicate incorrigibility. *See infra* Part I.D. Science tells us that when this offense occurred – and even still – Jalen Kelley's brain was not fully matured and developed. The Defense does not minimize the gravity of the convictions, the harm detailed in the victim impact statements, or the accusations others have made, and the Court should be and likely is deeply troubled by the evidence underlying the jury's verdict. But there is also evidence to support enabling community therapeutic intervention rather than incarcerating Jalen Kelley far into adulthood in a prison system that will do no more than punish a youth who is redeemable. The Defense asks the Court to enable community treatment during his youth.

## I.    JALEN'S HISTORY AND CHARACTERISTICS AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ARE IMPORTANT CONSIDERATIONS FOR THE COURT TO WEIGH.

While Jalen maintains his innocence and would never criticize his family, it is necessary for counsel to review his life to date and examine how his history, ███████████████, may

2

have contributed to the present. It is true that Jalen has had many opportunities afforded to him throughout his life that many do not have, including two parents, a good education, and life essentials. ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Counsel offers this information for the purpose of considering Jalen's history and characteristics and the nature and circumstances of the offense, not to blame or excuse any conduct of which Jalen has been convicted. 18 U.S.C. § 3553(a)(1); *see Gall v. United States*, 552 U.S. 38, 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." (citation omitted)).

██  ██████████████████████████████████████████████████████████
██████████████████████████████

██  ████████████████████████████████████████████████████████████
████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████











---

[3] *All available at* https://www.espn.com/nfl/story/_/id/7638140/ex-denver-broncos-player-perrish-cox-acquitted-sexual-assault; https://www.cnn.com/2014/09/09/us/ray-rice-timeline/index.html; https://www.theguardian.com/sport/2022/jan/18/ben-roethlisberger-pittsburgh-steelers-quarterback-nfl-sexual-assault-allegations#:~:text=The%20NFL%20finally%20swooped%20in,for%20releasing%20air%20from%20footballs.





████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

████████████████████████████████

████████████████████████████████████████

### C.    As A Young Adult, Jalen Goes From College Kid To Convicted Sex Offender.

Jalen graduated from high school in 2021 with a promising future. Jalen had hoped to play



football at a Division 1 school, but ended up attending a Division 2 school instead with a better scholarship package. Before he started his freshman year at Wingate University, he started a new social media profile as he hoped to start fresh in a new environment.

In his first two years at Wingate, Jalen earned decent grades and declared a major in exercise science. Exhibit F, College Academic Records. He made friends on campus and on the

*Jalen's senior portrait*

football team. While avoiding the college party lifestyle, Jalen remained close with his family, often calling his parents and grandmother, and coming home during the summers.

When Jalen was arrested in the fall of his junior year 9 months after his family's wintertime cruise, he was merely a few days past his 21st birthday. Over the next weeks, while housed with men far older, he was transported to multiple detention centers up the east coast until arriving at CDF.



*Jalen playing football*

Removed from his college courses, Jalen has tried to further his education and development by completing numerous short class sessions available through his CDF tablet. Exhibit G, CDF Transcript and Certificates. After spending 19 months in detention, Jalen will do everything necessary to never put himself in a position that deprives him of the liberty that he has had to reflect on losing each day.

### D. The Jury Has Found Jalen Guilty Of Serious Offenses, But We Ask The Court To Consider An Alternative To A Lengthy Carceral Sentence Given His Young Age.

While Jalen maintains his innocence, counsel recognizes the jury convicted him of very serious offenses, and the nature and circumstances of the offense is a factor the Court must consider in determining an appropriate sentence. In weighing this factor, in particular, the Defense asks the Court to consider Jalen's age at the time of the offense.

A wealth of Supreme Court cases contain powerful language and reasoning underpinning the now-established principle in American jurisprudence: "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. 98, 105 (2021); *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) (explaining that "punishment should be directly related to the personal culpability of the criminal defendant," and "adolescents as a class are less mature and responsible than adults" (citation omitted)); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) ("Indeed, '[t]he relevance of youth as a

mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993))); *Graham v. Florida*, 560 U.S. 48, 73 (2010) ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."); *Miller v. Alabama*, 567 U.S. 460, 489 (2012) ("[C]hildren are constitutionally different from adults for sentencing purposes."); *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y 2021) (exploring how to consider youth under the § 3553(a) factors). These cases inherently recognize that youth matters because of the evolving, developing nature of the human brain as one grows over time. *See J.D.B. v. North Carolina*, 564 U.S. 261, 273 n.5 (2011) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." (citing *Graham,* 560 U.S. at 68)).

Indeed, U.S.S.G. § 5H1.1 recognizes youthfulness as a ground for a downward departure for these various reasons:[5]

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense . . . . Certain risk factors may affect a youthful individual's developing into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals are also more amenable to rehabilitation.

---

[5] As explained by Amendment 829, § 5H1.1 was recently amended to add the consideration of a defendant's youthfulness at the time of the offense or prior offenses to be in line with the U.S. Sentencing Commission's statutory duty to "establish sentencing policies that reflect 'advancement in knowledge of human behavior as it relates to the criminal justice process.'" U.S. Sent'g Comm'n, Amendment 829, https://www.ussc.gov/guidelines/amendment/829 (last visited Apr. 16, 2025). The Commission specifically recognized that the "amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability." *Id.*

… Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

Here, the jury convicted Jalen of sexually assaulting L.C. when he was 20 years old. Even though he was legally an adult, this does not mean that Jalen cognitively functioned as a full-fledged adult. In fact, quite the opposite. At 20, he was in the age group in which a person's brain is still developing in fundamental ways that impact decision-making ability. Now at 22, he remains in that category.

Dr. Jennifer Woolard, a Georgetown University Professor and Chair of the Psychology Department, has conducted research for over 25 years on judgment and decision-making capacities in legal contexts with a focus on adolescents and young adults. At Exhibit H, Dr. Woolard describes and distills the scientific research in brain and behavioral development among young adults from adolescence through their young adult years. As she writes, "[T]echnological advances in the past ten to fifteen years demonstrate the continued growth and reorganization of the brain during the teen and even the young adult years." *Id.* at 3. At the time of the offense (and even still), Jalen fell well within the age group of individuals whose brains are still maturing in the key area of "deliberate thinking," meaning "the abilities to identify and consider future consequences, regulate emotions, and control impulses." *Id*. at 6. Dr. Woolard clarifies that, although "adolescents and young adults do have some capacity for self-control . . . while the brain is still developing, that immature capacity is more easily overwhelmed by circumstances . . . . As teens and young adults mature, they become better able to control impulses, regulate their emotions, have greater foresight, and plan ahead." *Id*. at 8. Still in his early twenties, Jalen's decision capacities are continuing to mature. *Id*. at 3, 9.

This research is critical for the Court's consideration for two reasons. *First*, in assessing the nature and circumstances of the offense, we ask the Court to carefully weigh the immature stage of Jalen's brain development, including the inability to control impulses and regulate emotions, with the conduct underlying the convictions. In particular, Jalen's age at the time of the conduct of which he was convicted mitigates against any conclusion that he is incorrigible and must be incapacitated. *See Graham*, 560 U.S. at 73 ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.").

*Second*, Jalen is still at the age where his brain is continuing to develop and mature. *Id.* at 3.[6] At his age, it is important that he be exposed to pro-social, positive learning mechanisms and outlets. *Id.* at 9-11; *see also* University of Rochester Medical Center, "Understanding the Teen Brain" (2000-2025), https://www.urmc.rochester.edu/encyclopedia/content?ContentID=3051 &ContentTypeID=1 (advising parents to "[d]iscuss[] the consequences of [their children's] actions" to "help . . . link impulsive thinking with facts" so as to "make connections and wire[] the brain to make this link more often"); The Annie E. Casey Foundation, "Adolescent Brain Development," https://www.aecf.org/topics/adolescent-brain-development (last visited Apr. 16, 2025) ("Long-term confinement of youth for the kinds of mistakes inherent to their sprinting brains is tantamount to a runner fracturing their ankle; it stops the race. Their futures are shattered — permanently altered because of a mistake whose consequences their brains didn't have the ability

---

[6] Experts estimate that the brain finishes developing and maturing in the mid-to-late 20s. National Institute of Mental Health, "The Teen Brain: 7 Things to Know," https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know#:~:text=The%20brain%20finishes%20developing%20and,prioritizing%2C%20and%20ma king%20good%20decisions (last visited Apr. 16, 2025).

to grasp.") As will be discussed later, *see* Part III.C, this point mitigates in favor of a lesser prison sentence and more supervision.

## II.   A LENGTHY CARCERAL SENTENCE IS NOT NECESSARY TO AVOID UNWARRANTED SENTENCING DISPARITIES.

As in all cases, the Court is called upon to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). In the same vein, the Court must avoid sentencing defendants similarly who are dissimilarly situated. *See Gall*, 552 U.S. at 55 (recognizing need to avoid "unwarranted *similarities*" between defendants who are not similarly situated (emphasis in original)). This case presents several disparity considerations.

*First*, the advisory guideline calculation and aggregate sentencing data by the U.S. Sentencing Commission are of limited value in this case. As courts recognize, the advisory guideline range is one factor of many for the Court's sentencing consideration. *Id.* at 59. And the aggregate sentencing data is simply that – a data point. Neither account for the full analysis of all § 3553(a) factors and neither is an individualized sentencing assessment. *United States v. Davis*, 130 F.4th 114, 124 (4th Cir. 2025) ("The task of a sentencing judge is to conduct an 'individualized assessment of the facts and arguments' and—as part of fashioning a substantively reasonable sentence—to 'determin[e] the weight to be given each of the § 3553(a) factors' and decide, 'on a whole,' how the balance of those factors justifies a particular sentence." (citation omitted)).

Here, for example, the PSR points to the average length of imprisonment of 163 months for the 22 defendants who received a sentence of imprisonment whose primary guideline was § 2A3.1 with a final offense level of 36 and a criminal history category of I for the fiscal years of

17

2019-2023. PSR at 24.[7] Yet, the PSR contains no further information about these 22 individuals such as their age at the offense, their history, the nature and circumstances of the offense, prior interventions, or recidivism risk. Further, the small sample size diminishes any value that can be accorded to this data. Affording more weight to the guideline range and aggregate data than merited raises the risk of sentencing disparity in this case.

Because so few of these cases are prosecuted federally, counsel is aware of the racial optics that may be perceived in not only prosecuting a case federally that involves a Black male defendant and white female victim, but also in imposing a significantly lengthy carceral sentence in such a case. To be clear, counsel is not alleging any sort of selective or vindictive prosecution claim but merely raising conclusions the community may draw in perceived disparities between this case and others.

*Second*, while the jury convicted Mr. Kelley of a serious offense, and the Defense does not seek to diminish the serious nature of the verdict, we also ask the Court to weigh this case against the backdrop of others in deciding the appropriate sentence. At the time of the offense, Jalen was 20, barely into adulthood, and ███ was recently 17. This is not a case of murder, or a case in which an older, custodial parent or caregiver has raped a child, or a case of a violent rape committed at gunpoint or with a knife. Jalen has never been accused of behaving inappropriately with anyone other than a similarly-aged peer.

## III.    A LENGTHY CARCERAL SENTENCE IS NOT NECESSARY TO FULFILL THE § 3553(a) SENTENCING GOALS, WHICH HAVE BEEN AND CAN CONTINUE TO BE ADDRESSED IN OTHER WAYS.

As the Court knows, a key consideration at sentencing is the goals of sentencing:

---

[7] Notably, Jalen would be charged in state court but for the unique jurisdiction issue in this case. There, he would be facing a significantly lower guideline range inclusive of single digits.

retribution, deterrence, punishment, and rehabilitation. *See* 18 U.S.C. § 3553(a)(2). An analysis of each of these goals shows a lengthy carceral sentence at or above the advisory guidelines range is not necessary given an individualized assessment of this case and, instead, these goals can be achieved in other ways.

> **A.  Federal charges, lengthy pre-sentencing incarceration, and the enduring consequences of a sex offense conviction have and will continue to promote respect for the law and provide significant punishment.**

Prior to this case, Mr. Kelley did not have any convictions. Now, at 20 years old, he has three federal felony convictions for sexual assault, solely due to the location of the cruise ship at the time of the offense. Given the additional serious stigma associated with federal cases, the prosecution alone has sent a significant message that these cases are taken seriously and that the law must be respected. Continued monitoring – through supervision and sex offense registration – will continue to promote those twin goals of promoting respect for the law and recognizing the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2)(A).

Moreover, given Mr. Kelley's age and lack of criminal history, the punishment has already been severe. On the morning of Jalen's arrest, he awoke a college junior expecting to soon graduate, find employment, and navigate the beginnings of early adulthood. Instead, for nearly 19 months, he has lived in a small jail cell in close quarters with others far older and far more experienced in the criminal justice system. He had never before been incarcerated, not even in a juvenile detention facility, without access to a hug from family. The clothing Jalen's mother purchased for trial was a painful reminder of his separation from family and society, as well as the physical changes his body has endured. Jalen was arrested as a healthy athlete, as evidenced by the pictures in the PSR and at trial. He has since physically deteriorated, putting on significant weight due to prison food options, depression, and an inability to exercise.

The punishment is also imposed through public humiliation and lifelong collateral consequences. Given the local attention this case received in North Carolina and Maryland, Jalen's college and local communities have learned of his charges[8] and convictions.[9] He has gone from a collegiate athlete to an unrecognizable sex offender whose convictions have dealt him a pervasive, enduring stigma. He must now register as a sex offender wherever he lives and works, possibly for the rest of his life, as is his fate if he lives in Maryland after serving his sentence. His educational and job prospects will be limited due to the nature of his convictions. He will be subject to supervision monitoring and related restrictions. Long after his incarceration period ends, his status as a convicted sex offender will be lifelong punishment.

**B.    The last 19 months have taught Jalen deterrence lessons and sent a general deterrence message to the public.**

Jalen maintaining his innocence is not inconsistent with having learned important deterrence lessons since September 2023. *See* 18 U.S.C. § 3553(a)(2)(C). To the extent Jalen needed an intervention before, none approached the magnitude of the daily harsh experience he has had over the past 19 months—being charged as an adult in federal court, detained with far older men, withdrawn from college, and having sat through a detention hearing, multiple pretrial

---

[8] *E.g.*, Hayleigh Chapman, "FBI Arrests Wingate Football Player on Campus After Sex-Crime Indictment," Wingate Triangle (Oct. 2, 2023), https://theweeklytriangleonline.com/2023/10/02/fbi-arrests-wingate-football-player-on-campus-after-sex-crime-indictment/; WMAR Staff, "Abingdon Man Federally Indicted for Allegedly Sexually Assaulting Woman Aboard Carnival Cruise Ship" (Sept. 22, 2023), https://www.wmar2news.com/local/abingdon-man-federally-indicted-for-allegedly-sexually-assaulting-woman-aboard-carnival-cruise-ship.

[9] *E.g.*, Melissa Koenig, "Carnival Cruise Rapist Unmasked as College Football Star with Habit of Sexually Assaulting Girls," Daily Mail (Dec. 18, 2024), https://www.dailymail.co.uk/news/article-14207845/Carnival-Cruise-rapist-Jalen-Thomas-Kelley-Wingate-football-sexual-assault-history.html; Julia Marnin, "Cruise Passenger Raped 17-Year-Old on Carnival Ship and Assaulted 8 Others, Feds Say," Miami Herald (Dec. 16, 2024), https://www.miamiherald.com/news/nation-world/national/article297186524.html.

hearings, and a two-week trial in which peers testified about intimate acts and the fate of his life was in a group of strangers' hands. Jalen has been sent a message. The terror of this experience has fully deterred him from criminal conduct.

Jalen recognizes the Court must consider general deterrence too. Well-recognized research supports that a deterrent message has been sent with the fact of prosecution and conviction, as well as the 19 months Jalen has spent in a detention facility. *E.g.*, David Weisburd et al., "Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes," 33 Criminology 587 (1995) ("There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms."); Ben Johnston, *Do Criminal Laws Deter Crime? Deterrence Theory in Criminal Justice Policy: A Primer, Minnesota House Research Department* 6 (Jan. 2019); Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?," 100 J. Crim. L. & Criminology 765, 801 (2010); National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014). In other words, it is the certainty of punishment, not the length of the sentence that deters. It does not make a material difference in sending a general deterrent message whether Jalen is sentenced to a single digit period of incarceration as opposed to 15 years or something more.

Indeed, that point is reinforced by common sense. Long after this case concludes, there will be countless young people coming of age in middle school, high school, and college in what has become a highly sexualized youth culture. Whether or not someone makes the horrible decision to rape another person will not depend on whether Jalen gets a single digit sentence versus a 15-year sentence or more. This case is unlikely to change interactions between young people. To the extent this case can impact those interactions, it already has, with the hope that some parents who learned

about this case will speak to their children about how minutes in a hallway, a restroom, a cruise cabin can forever change a life. Whether or not that message is shared with children will not depend on how much time this Court imposes on Jalen.

### C. Federal supervision is an "available sentence" that can provide ongoing monitoring to the public and provide treatment in the most effective manner.

Given the Rule 413 evidence in this case, the Defense anticipates the Government will argue Mr. Kelley is a danger to the public and needs to be incapacitated given escalating behavior through middle school, high school, and college. The Defense addresses here why that argument neither accounts for social science research about brain development nor research that supports the efficacy of specialized sex offender treatment, including in community-based settings. These points are relevant because they address the need for the sentence imposed to protect the public and provide treatment in the most effective manner, as well as the "kinds of sentences available." *See* 18 U.S.C. § 3553(a)(2)(C) & (D), (a)(3).[10]

Mr. Kelley is not a danger to the community who needs to be incapacitated for a lengthy period of time. Even if the Court credits past allegations of sexual misconduct against Mr. Kelley and weighs them with the convictions in this case, the Court does not have evidence to conclude Jalen is an incorrigible individual who must be kept away from society for a lengthy period of time. In *Graham v. Florida*, the Supreme Court addressed this very point:

> Incapacitation, a third legitimate reason for imprisonment, does not justify the life without parole sentence in question here. Recidivism is a serious risk to public safety, and so incapacitation is an important goal. *See Ewing*, *supra*, at 26 (plurality opinion) (statistics show 67 percent of former inmates released from state prisons are charged with at least one serious new crime within three years). But while incapacitation may be a legitimate penological goal sufficient to justify life without parole in other contexts, it is inadequate to justify that punishment for juveniles who did not commit homicide. **To justify life**

---

[10] As the Court knows, "the Guidelines are only one of the factors to consider when imposing sentencing, and § 3553(a)(3) directs the [Court] to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59.

> **without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable. "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."** *Roper, supra*, **at 572. As one court concluded in a challenge to a life without parole sentence for a 14–year–old, "incorrigibility is inconsistent with youth."** *Workman v. Commonwealth*, 429 S.W.2d 374, 378 (Ky. 1968).

560 U.S. at 72-73 (emphasis added). Given his young age, the Court's conclusion should not be that Jalen is an incorrigible sex offender but, rather, a young person in the midst of brain maturation and development who needs meaningful intervention in the form of rehabilitation.

The Court should not conclude that, because allegations were made in the past and raised to school officials, Jalen has demonstrated that he cannot learn a lesson and, thus, needs to be incapacitated. According to one article funded by the U.S. Department of Justice Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, the most promising effective interventions in reducing recidivism in juvenile sex offenders "incorporate cognitive-behavioral techniques along with group therapy and family therapy." U.S. Dep't of Justice, Office of Justice Programs, Roger Przybylski, "The Effectiveness of Treatment for Juveniles Who Sexually Offend" 2-4 (July 2015) (Exhibit I).[11] The types of specialized treatment mentioned in this study include family and group therapy. *Id.* Jalen has not had this type of specialized treatment. Despite everyone's best efforts, the parental meetings with school staff, several months in an alternative school, brief sessions with a ███ case management specialist talking about his grades and employment, and brief sessions with a counselor whose notes are devoid of any substance, these acts were not the type of interventions that would have produced promising results. This is

---

[11] *Available at* https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/juveniletreatment.pdf.

not to mention the lack of ██████████████████████████ to these allegations—a far cry from the family and group therapy that is part of meaningful intervention in this area.

This study also makes clear that effective, specialized treatment can take place in the community. *Id.* at 2-3 (referencing positive treatment effects from community-based programs). Given the limitations in the Bureau of Prisons, counsel believes Jalen faces more promising rehabilitative opportunities with forthcoming community-based treatment through imminent supervised release than he does in the Bureau of Prisons (BOP).

One concern is that, in the BOP, Jalen will not receive sex offender treatment until the end of his sentence. Another concern is that Jalen might not receive the level of intensity that would be beneficial to him. To participate in the higher intensity programming offered through the BOP's residential sex offender treatment program, Jalen would have to be housed at a facility further away from his family than he would likely otherwise be placed (*i.e.*, USP Marion in Illinois or FMC Devens in Massachusetts).[12] If he participates in the non-residential treatment program, it consists only of outpatient group meetings 2-3 times per week for several hours for a period of 9-12 months. A third concern is the shortage in BOP staffing. *See* U.S. Senate Committee on the Judiciary, "Durbin Urges OPM To Approve Special Pay Rate for BOP Employees to Address Critical Staffing Shortages at BOP Facilities Nationwide" (Jan. 14, 2025), , https://www.judiciary.senate.gov/press/dem/releases/durbin-urges-opm-to-approve-special-pay-rate-for-bop-employees-to-address-critical-staffing-shortages-at-bop-facilities-nationwide (referencing a loss of 9,000 staff positions since 2016 and noting that "current staffing shortages are at a 'critical level'").

---

[12] Federal Bureau of Prisons, "Sex Offenders," https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp (last visited April 17, 2025).

Simply put, the Court has both a responsibility and the authority under § 3553(a)(3) to consider imposing a sentence that does not include prolonged incarceration and instead immediately enables tailored rehabilitation to address what brought Jalen Kelley into federal court at so young an age despite his potential. A lengthy carceral sentence may be detrimental to Jalen's ability to make productive use of the next few years when his brain is reaching full maturity. Exhibit H at 9 ("The still-maturing psychosocial capacities that might contribute to the rates of risk taking and offending that remain relatively high in young adulthood are likely more amenable to intervention strategies that facilitate the transition to productive engagement with society and desistance from offending."). This research and data suggests that it would be better for him, and the community, if the Court, with the aid of U.S. Probation, structured a far more intense regimen of comprehensive sex offense treatment while on strict supervised release. That regimen could include home detention, GPS monitoring, community sex offense treatment, family therapy, and numerous other conditions to enable meaningful oversight and effective intervention.

## CONCLUSION

For these reasons, we ask the Court to sentence Jalen Kelley in a manner that enables effective community-based supervision and treatment to commence during his youth.

At sentencing, several family members, including his mother, father, paternal grandmother, and older sister, may wish to address the Court briefly regarding Jalen's history and character.

We ask that the judgment reflect pre-sentence confinement credit from the date of Jalen's arrest on September 21, 2023, and that supervised release conditions include mental health and sex offense treatment, and academic and vocational programming,

Respectfully submitted,

_____/s/_____
Sedira Banan (#804827)
Maggie Grace (#29905)
Assistant Federal Public Defenders
Counsel for Jalen Kelley
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
Email: sedira_banan@fd.org
        maggie_grace@fd.org

Cc: Sean Delaney, Colleen McGuinn, AUSAs; Carissa Perez, USPO

26