UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> JALEN KELLEY | Case No. JRR-23-327 |

**DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

Jalen Kelley, through counsel, files this response to the Government's sentencing memorandum. The Government asks the Court to impose a major upward variance (a sentence of 30 years) to account for alleged conduct beyond the offense of conviction and Mr. Kelley persisting in his assertion of innocence. The Government's requested sentence disregards the frailties of youth, the science of brain development, the lack of effective intervention by parents and school authorities, and the hope of rehabilitation for an extremely young person. In fashioning the appropriate sentence to fulfill the § 3553(a) factors, the Defense asks the Court to consider strongly the cognitive science in youthful offender and sentencing jurisprudence which cautions against leaping to damning judgments about incorrigibility given a young person's capacity for change and limited moral culpability. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48 (2010); *see also* Def. Mem. 13-16. The Defense asks the Court, in sentencing Jalen Kelley for conduct that occurred between the ages of 11 and 20, to recognize that there is hope for him, as "[m]aturity can lead to that considered reflection which is the foundation for remorse, renewal and rehabilitation." *Graham*, 560 U.S. at 79. The Defense submits that a significant downward variance is appropriate, in particular because of Mr. Kelley's youth.

1

I. **THE GOVERNMENT HAS NOT PROVEN THE TWO-LEVEL § 2A3.1(b)(4)(B) "SERIOUS BODILY INJURY" ENHANCEMENT APPLIES.**

The Government and Probation believe the advisory Guideline range is 188-235 months' imprisonment (corresponding to total offense level 36 and CHC I). The Defense believes the advisory range is 151-188 months' imprisonment (corresponding to total offense level 34 and CHC I). The difference lies in whether the Government has proven that L.C.'s injuries meet the legal definition of "serious bodily injury" pursuant to § 2A3.1(b)(4)(B)—a legal argument the Defense makes without minimizing the harms articulated by L.C. and her family in their victim impact statements.

Application Note 1 of the Commentary to § 1B1.1, which is incorporated by reference into § 2A3.1, defines "serious bodily injury" (SBI) as follows:

> **[1]** "Serious bodily injury" means injury involving extreme physical pain or the protected impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. **[2]** In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or 2242 or any similar offense under state law.

Because the Government concedes the definition in the second sentence cannot apply when the Court is calculating the offense level in a § 2241 case, whether the enhancement applies depends on whether the Government can prove the definition in the first sentence is met—specifically, that Mr. Kelley caused "extreme physical pain or the protracted impairment of a bodily member, organ, or mental faculty; or require[ed] medical intervention such as surgery, hospitalization, or physical rehabilitation." Because there is no evidence L.C. sustained such an injury – whether the injury is genital injuries or wrist/shin bruises – the enhancement does not apply.

<u>Background on genital injuries.</u> As the Court remembers, L.C. did not seek out medical attention in the late-night hours of January 1, 2023, or the early morning hours of January 2, 2023.

2

After the Cox family returned to Virginia and made a report to law enforcement, L.C. went for a forensic examination for evidence collection. During the exam, Nurse Pullen asked about pain or bleeding. L.C. reported she had some bleeding after but was not sure if it was related to her period just ending. She reported that it stung after she went to the bathroom, hurt to wipe, and that her pain was a 6-7 on a 10-level scale. Although she felt soreness and burning in the genital area before the exam, she did not testify to any prolonged pain.

At trial, Nurse Pullen testified that L.C.'s injuries were not inconsistent with consensual sexual intercourse, and that she would not be able to determine whether the blood on the recovered underwear was period blood or something else. While Nurse Pullen testified about blood she observed during the exam, the blood appeared only after she manipulated around the hymen. No treatment was administered or ordered for any injury to the hymen.

At the conclusion of the exam, L.C. was not admitted to the hospital, and she was given sexually transmitted disease prophylaxis medications. She was not prescribed pain medication. Nurse Pullen did not schedule a follow-up appointment for L.C., as is routine, and L.C. never returned to Nurse Pullen for any follow-up care. According to L.C.'s testimony, she did not seek any follow-up medical care for any genital injury.

<u>Background on right forearm and shin bruising.</u> At trial, the Government introduced evidence regarding a small bruise on L.C.'s right forearm and bruises on each of L.C.'s shins. L.C. testified that she assumed these bruises were caused by Mr. Kelley's hands on her wrist and the bed frame. There was no evidence presented at trial that L.C. experienced any pain related to the bruises or that they failed to heal properly.

Here, the Government has not proven the SBI enhancement applies. *First*, these injuries and bruises do not, individually or collectively, rise to grave level of harm that is set out in the first

sentence of the SBI definition above. *See* U.S.S.G. § 1B1.1 cmt. app. n.1 ("[I]njury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."). One court has referred to the standard set forth in the commentary's definition as "the fairly *egregious* injury standard." *United States v. Jim*, 786 F.3d 802, 815 (10th Cir. 2015) (emphasis added). Indeed, this makes sense, as the SBI enhancement is one of the enumerated "specific offense characteristics" to § 2A3.1. Specific offense characteristics are meant to distinguish each case from the next, assisting the Court in determining where, on the spectrum of conduct, an instant case falls. *See generally* U.S.S.G. Chapter 1.

      L.C. never sought out medical help for the genital injuries or her wrist/shin bruises. When she underwent a *forensic* examination for evidence collection, she did not describe an extreme level of pain or injury, she was not actively bleeding, she left without being prescribed pain medication, and she never returned for follow-up care. Where courts *have* applied the enhancement, the injury was of a far greater degree than in this case. *See, e.g.*, *United States v. Long Turkey*, 342 F.3d 56, 858-59 (8th Cir. 2003) (upholding SBI enhancement where victim suffered rectal laceration requiring repair at hospital, had severe pain, had a bruised scalp due to being restrained by her hair, and was hospitalized overnight); *United States v. Bruguier*, 161 F.3d 1145, 1148, 1153 (8th Cir. 1998) (tear to perineum); *United States v. Jim*, 347 F. Supp. 3d 847, 862 (D.N.M. 2018) (23-25 lacerations to genitals and anus, some nearly 3.5 centimeters long; bruising all over arms, legs, and back; overwhelming pain so severe it prompted ER physician to recommend CT scan to determine if victim suffered rectal wall rupture), *aff'd*, 804 F. App'x 895 (10th Cir. 2020); *United States v. Chee*, 173 F.3d 864, at *7 (10th Cir. 1999) (unpublished) (bruises and abrasions all over body). Finding that the harm to L.C. does not rise to the level required for

4

the SBI enhancement in no way diminishes L.C. or her family's experience. Rather, this evaluation allows the Court to assess where the offense to be punished falls on the scale of depravity.

*Second*, courts are exacting in scrutinizing the nature of the injuries to avoid impermissible double-counting. In *United States v. Jim*, the Tenth Circuit expressed concern about applying the enhancement for injuries sustained through the force that was necessary to sustain a sexual abuse *by force* conviction. 786 F.3d at 816 n.7. There, the court did not have to decide whether there would be impermissible double counting because the Government did not seek to support the SBI enhancement "with injuries the victim suffered as a result of [the defendant] forcing her to submit to that sexual abuse [by force] by dragging her off the couch and down the hallway into the bedroom and then holding her down." *Id.* Here, to the contrary, the Government *is* relying on bruising that was necessary to convict Mr. Kelley of sexual abuse *by force*. And, as such, is asking the Court to engage in the very type of double counting that is out of bounds.

For these reasons, the two-level § 2A3.1(b)(4) SBI enhancement should not apply. Accordingly, the total offense level is 34 (not 36) and the range is 151-188 months' imprisonment.

II.   **PENALIZING MR. KELLEY AT SENTENCING FOR EXERCISING HIS TRIAL RIGHTS AND HIS CONTINUED ASSERTION OF INNOCENCE RISKS VIOLATING HIS CONSTITUTIONAL RIGHTS AND IGNORES THE U.S. SENTENCING GUIDELINES.**

Much of the Government's sentencing memorandum asks the Court to impose a significant upward variance because Mr. Kelley has not confessed to sexually assaulting L.C. and, instead, decided to pursue his constitutional right to trial. *See, e.g.*, Govt. Mem. 20 ("He has demonstrated no remorse for—or even acknowledgement of—his many sexual assaults."); *id.* at 29 ("Then, when charged with rape in this case, he proceeded to attack Victim 1 and his other victims in trial

5

through cross-examination and arguments alleging they perjured themselves.").[1] The Government's reasoning infringes Mr. Kelley's constitutionally protected rights (Fifth and Sixth Amendments) and ignores the mechanism that is already in place (the Guidelines) to account for the fact that Mr. Kelley exercised his trial rights.

Mr. Kelley has a constitutional right to maintain his innocence by not confessing guilt and putting the Government to its burden of proof, which includes cross-examining his accusers through zealous trial defense. U.S. Const. amends. V, VI. Enhancing Mr. Kelley's sentence for declining to confess guilt, going to trial, and maintaining his innocence through an appeal violates his Fifth and Sixth Amendment rights. *See, e.g.*, *United States v. Laca*, 499 F.2d 922, 927 (5th Cir. 1974) ("[B]y opining that these defendants had not shown an inclination towards repentance, the court erred by predicating the length of these sentences on whether the defendants had confessed their crimes. This conditioning of sentences on defendants' confessions violated their right to avoid self-incrimination under the Fifth Amendment."); *Thomas v. United States*, 368 F.2d 941, 946 (5th Cir. 1966) ("When Thomas received harsher punishment than the court would have decreed had he waived his Fifth Amendment rights, he paid a judicially imposed penalty for exercising his

---

[1] *See also* Govt. Mem. 2 ("He has shown no remorse for his predatory conduct."); *id*. at 29 n.4 ("It is noteworthy that in the Defendant's submission to the Office of Probation regarding the statement of facts to the Presentence Report, the Defendant requests the phrase, 'The evidence at trial established that Victim 1,' be modified to 'Victim 1 testified that.'"); *id*. at 20 ("During the investigation, the Defendant lied to investigators about having any sexual contact with Victim 1 and then reversed course, spending the entire trial blaming Victim 1, arguing that the encounter was consensual. This defense stood in direct and stark contrast with the Defendant's assertions during the investigation…."); *id*. at 31 ("In cases of sexual assault, the ammunition used in defense often translates to a simple presumption that the accuser, the victim, is lying. It is often the victims who feel that they, rather than their perpetrator, are on trial. And here, six of the victims bravely faced cross examination and insinuations that they made up these allegations, their traumas, because the Defendant rebuffed them or rejected them or because they wanted attention. A meaningful sentence imposed by the Court should also reflect that these victims are believed, they are seen, and they matter.").

constitutionally guaranteed rights."); *United States v. Capriola*, 537 F.2d 319, 320 (9th Cir. 1976) (noting that if "more severe sentences were imposed upon [the defendants] because they exercised their right to stand trial," their "constitutional rights . . . have been infringed"). In our adversarial system, it is incumbent upon defense counsel and the Court to safeguard a defendant's constitutional rights by ensuring punishment is not imposed because someone pursued their rights, particularly in the case of a very young defendant.

Moreover, the Government fails to explain how – in the face of a Guidelines scheme that exacts a "trial penalty" – a huge upward variance is justified for this reason. As the Court knows, the Guidelines account for Mr. Kelley continuing to profess innocence for his offense through U.S.S.G. § 3E1.1. That Guideline specifically allows for a reduction of up to three levels where a defendant clearly demonstrates acceptance of responsibility—something that is rarely given when, a defendant, like Mr. Kelley, decides to go to trial. As the PSR reflects, Mr. Kelley has had zero points subtracted from his offense level due to professing innocence for the offense. PSR at 8. Where the Guidelines already take into account the fact that Mr. Kelley went to trial rather than pleading guilty, the Government's request for a significant upward variance that is based, in part, on Mr. Kelley's failure to accept responsibility rings hollow.

**III.   THE COURT HAS BEFORE IT EVIDENCE OF A CHILD AND YOUNG PERSON WHO HAS NOT RECEIVED NEEDED GUIDANCE, NOT A "PREDATOR" WITH "NO REDEEMING QUALITIES."**

The Defense can appreciate the emotional fervor motivating the Government's sentencing request in this case. But the Defense cannot let stand the portrayal of Mr. Kelley as a "serial predator" with "no redeeming qualities" who, since the age of 11, has "stalked his prey" and had a "slick ability to manipulate," in an almost "pathological" way, his parents, school administrators, and law enforcement. *See* Govt. Mem. 1, 2, 22, 26. The Court should not sentence Mr. Kelley

based on an emotionally charged narrative that entirely ignores the mitigating and hopeful role that youth plays at sentencing.

In casting Mr. Kelley in this way, the Government has lost sight that this case is about Mr. Kelley's alleged conduct from the ages of 11 to 20—when he was literally a child by any definition of the word to when he was a young adult. The idea that a ***child*** could manipulate every single person around him – peers, parental figures, school administrators, law enforcement – in the way the Government maintains is too far a reach. This is not a case of a recidivist sex offender adult who has demonstrated that he cannot learn through *effective* judicial intervention, including court-ordered treatment. This is a case of a 22-year-old who is facing sentencing for a sexual assault that occurred when he was 20 years old after he allegedly engaged in other sexual misconduct during middle school and high school, yet, even by the Government's own admission, never received necessary intervention by adults who were in positions of trust and guidance.

For decades, the Supreme Court has recognized that "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. 98, 105 (2021). The particular passage below from *Graham v. Florida* summarizes the issue:

> *Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U.S., at 569. **As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are " not as well formed."** *Id.,* at 569–570. **These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."** *Id.,* at 573. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.,* at 569. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson, supra,* at 835 (plurality opinion).
>
> No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.

8

> For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. 16–24; Brief for American Psychological Association et al. 22–27. **Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults.** *Roper,* 543 U.S., at 570. **It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."** *Ibid.*

560 U.S. at 68 (emphasis added); *see also id.* at 73 ("Graham deserved to be separated from society for some time in order to prevent what the trial court described as an 'escalating pattern of criminal conduct,' [] but it does not follow that he would be a risk to society for the rest of his life."). As explained in Mr. Kelley's opening memorandum, these principles were adopted by the U.S. Sentencing Commission in recognizing youthfulness as a ground for a downward departure in U.S.S.G. § 5H1.1. These principles matter for this sentencing.

To believe the Government's account, Mr. Kelley somehow went – in not many years – from a child who could not speak intelligibly due to a speech impediment to manipulating adults decades older. What is far more likely is that Jalen Kelley has historically lacked the ability to communicate effectively (let alone manipulate adults), and his problematic sexual behaviors were due to the twin troubles endemic to youth: impulsivity and failing to think of consequences before acting. *See Graham*, 560 U.S. at 72 ("Because juveniles' 'lack of maturity and an underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions, they are less likely to take a possible punishment into consideration when making decisions.") (internal citation omitted).

Would Mr. Kelley likely benefit from sex offense treatment on boundaries of sexual behavior and the need for affirmative consent? Yes. Did he likely need therapeutic intervention before this case? Yes. But to stretch conduct from young peer-to-peer interactions with a classmate or coworker or college romantic interest into that of an incorrigible predator stalker and master

9

manipulator deserving three decades of incarceration is simply too far a reach.[2] The Court would be correct to be concerned about the repeated reports of sexually inappropriate behavior. But the Court should also be troubled by the Government's attempts to cast Jalen, who was no more than 20 on the cruise, as a predatory manipulator who has no redeeming qualities and, as such, needs to be kept away from society for 30 years, longer than he has been alive.

### IV. 30 YEARS IS EXCESSIVE, ARBITRARY, AND DISPROPORTIONATE.

The Government's requested sentence of 30 years is not only "greater than necessary" to fulfill the sentencing factors under § 3553(a), but is grossly excessive, arbitrary, and out of line with other sentencing dispositions. *See United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007) ("A sentence that does not serve the announced purposes of § 3553(a)(2) is unreasonable[, as is] a sentence that is greater than necessary to serve those purposes is unreasonable.").

As an initial matter, the requested sentence represents a *huge* upward variance, one that is rarely seen in any case in this District. A 30-year sentence is nearly *double* the high-end of the Defense's guidelines range (151-188 months) and a decade over the high-end of Government's range (188-235 months). This is particularly significant because one of the main reasons the Government requests a 30-year sentence is Mr. Kelley's failure to accept responsibility, a factor already accounted for in the Guidelines calculation.

Moreover, the Government fails to provide any justification for a specific sentence of 30 years. What is accomplished in 30 years versus 25 years versus 20 years or 15 years? Their number is arbitrary and solely backed by a pure purpose of incapacitation. Govt. Mem. 2 (asserting that 30

---

[2] Indeed, the Government knows this is revisionist and a sentencing tactic. If Mr. Kelley was such a predatory risk in society, why did the Government allow him to remain not only in the community, but in a college community with young women, for roughly nine months after learning of the report of the cruise ship sexual assault?

years is necessary to "protect the public from him until he reaches an age where he may no longer represent the same danger"). That is reasoning the Supreme Court has cautioned directly against: "Incapacitation cannot override all other considerations, lest the Eighth Amendment's rule against disproportionate sentences be a nullity." *Graham*, 560 U.S. at 73.

Further problematic, the Government makes no attempt to cite empirical data to justify such a massive sentence for a 22-year-old. Instead, the Government fails to grapple with something the Court is required to consider: Mr. Kelley's youth and treatment needs. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(D), (a)(3). On the one hand, the Government recognizes Mr. Kelley has had "failed parenting" and no "intervention." *Id.* at 23, 25. But on the other, the Government is requesting the first consequential intervention for Mr. Kelley should be imprisonment for *three decades*, longer than his life to date. That reasoning does not square and forswears the rehabilitative ideal for youth. *See Graham*, 560 U.S. at 74 (describing juvenile nonhomicide offender's capacity for change and limited moral culpability).

Further, there is no recognition from the Government that its extreme request is a length reserved for cases in this District with far more extreme harm. Sentences of 30 years are reserved for murders and sex offenses cases involving sexual exploitation of minors who are in extreme power differentials with the defendant (*e.g.*, a parent or caregiver). The gravity of the harm caused in those cases versus the gravity of the harm caused in this case is evidenced by the Guidelines.

The Guidelines in sex offense cases that involve three-decade long sentences are almost always *life*. Whatever the Court decides the Guidelines are in this case, they will be far below life. That is particularly true because there are specific offense characteristics that *would* increase the gravity of the harm to much higher but that *do not* apply here given the nature of the offense conduct. *See* U.S.S.G. § 2A3.1(b)(2) (requires addition of offense levels if the victim is younger

11

than 12 or between 12 and 16); *id.* (b)(3) (requires addition of offense levels if the defendant had certain control over the victim); *id.* (b)(5) (requires addition of offense levels if the victim was abducted); *id.* (b)(6) (requires addition of offense levels if there was certain deception or the use of a computer); *id.* (c)(1) (requires application of a different guideline producing a higher offense level if the victim was murdered); *id.* (c)(2) (requires application of a different guideline producing a higher offense level if the case involved production of child pornography).

The non-application of those specific offense characteristics is telling. This case involves young *peer-on-peer* sexual offenses, not sexual offenses where there is an age or power differential between the victim and the defendant. This case also involves a very young defendant where the prior allegations of sexual misconduct includes behavior from when he was 11 years old. And much of the prior conduct in this case involves *solely inappropriate sexual touching* and nothing more between *children* (e.g., ████████████████████████ ████████████████████.

The Defense recognizes the Court will likely have concerns about the two other incidents involving allegations of sexual intercourse. We ask the Court to consider two points. First, state prosecution entities have investigated the allegations made by ████████ and ████████ ████  A case is pending in North Carolina related to ████████ allegations. If these prosecutions result in convictions, a separate Judge will have the occasion to impose punishment and potentially consecutive punishment. Second, both allegations, while no doubt troubling, involve behavior that is readily addressable through therapeutic intervention—specifically, education to Mr. Kelley on the bounds of sexual consent with peers.

But even if the Court considers ████████ and ████████ allegations, the point still remains: a 30-year sentence for conduct that occurred when Mr. Kelley was 11-20 and has had no

prior meaningful intervention is a draconian sentence that cannot be justified. Even the low-end of the Defense's guidelines – 151 months (12.5 years) – is an interminably long sentence for a young person only 22 years old at sentencing who never before spent a night in jail and faces up to a lifetime of federal supervision. This is particularly true given that Mr. Kelley now has a federal conviction and will serve a federal sentence without the possibility of parole – increasing the severity of his punishment – solely because of the location of the offense conduct. While the Defense submits that 12.5 years is greater than necessary to fulfill the sentencing factors for all the reasons previously stated, it does not approach the excess of the Government's three-decade request. *Cf. United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014) ("Any sentence that is within or below a properly calculated Guidelines range is presumptively reasonable" and that presumption "can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors."); *Gall v. United States*, 552 U.S. 38, 51 (2007) (sentence outside the Guidelines carries no presumption of reasonableness).

  The Court has both an array of conditions as well as a lengthy term that it may impose to address any concerns about Mr. Kelley's rehabilitation and accountability in the community – from treatment conditions, to prohibitions, to requirements for polygraph testing. And because the Court may impose a lifetime supervision term, the Court can, if deemed appropriate, ensure that Mr. Kelley is always under the Court's supervision.

## **CONCLUSION**

  For all the reasons stated, the Defense requests a sentence that recognizes that youth matters in sentencing because cognitive science demonstrates the potential for change, and enables appropriate treatment in the community while Mr. Kelley is still young.

Respectfully submitted,

/s/
Sedira Banan (#804827)
Maggie Grace (#29905)
Assistant Federal Public Defenders
Counsel for Jalen Kelley
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
Email: sedira_banan@fd.org
        maggie_grace@fd.org

Cc: Sean Delaney, Colleen McGuinn, AUSAs; Carissa Perez, USPO